In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-2729

ROBERT ZELLNER, a Wisconsin resident,

*Plaintiff-Appellant,*

*v.*

DARYL HERRICK, a Wisconsin resident,
in his official capacity as Superintendent
of the Cedarburg School District, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:08-cv-00315—**Rudolph T. Randa**, *Judge.*

ARGUED FEBRUARY 10, 2011—DECIDED APRIL 29, 2011

Before MANION, EVANS, and HAMILTON, *Circuit Judges.*

EVANS, *Circuit Judge.* Robert Zellner, a high school biology teacher and former teacher's union president, was fired by his employer, the Cedarburg School District, for allegedly viewing pornographic images on his school computer in violation of District policy.

Zellner, believing instead that he was fired because of his union activities, filed a civil rights complaint under 42 U.S.C. § 1983 against Defendants Daryl Herrick, John Pendergast, and Linda Borkenhagen, in their official capacities, and the Cedarburg School District (we will refer to the defendants collectively as "the District"), alleging violations of his First and Fifth Amendment[1] rights. The district court granted the District's motion to dismiss with respect to Zellner's due process claim and the District's summary judgment motion with respect to his First Amendment claim. Zellner now appeals, and we view the facts, as we must at this time, in the light most favorable to Zellner.

Zellner worked at Cedarburg High School as a biology teacher for nearly eleven years until his employment was terminated on January 17, 2006. At all relevant times Jay Grieger was the Principal of the high school and Zellner's immediate supervisor. Herrick has been the Superintendent of the District since July 1, 2002. Pendergast, elected to the School Board in the spring of 2004, has been School Board President since 2005. Borkenhagen is the Director of Technology for the District.

Because Zellner asserts that he was fired as a result of his union activities, we begin with the years of animosity between the Union and the District leading up to Zellner's termination. While employed by the District, Zellner was an active member of the Cedarburg Educa-

---

[1] This claim is actually a Fourteenth Amendment claim. We'll refer to it as a due process claim as we move along.

tion Association (the "Union"). In the fall of 2003, Zellner became the president of the Union, serving in that position for two years. From 2005 until his termination, Zellner was the Union representative for the high school. Before, during, and after Zellner's term as Union president, relations between the Union and the District were plagued.

In 2003 Herrick recommended that the School Board not renew Principal Grieger's employment contract. The Board, however, rejected Herrick's proposal by a vote of four-to-three. Shortly thereafter, Zellner and 58 other high school staff members published a statement in a local paper that criticized Herrick and the Board for trying to oust Grieger. Later, Zellner was quoted in a local paper saying that Herrick and the District were creating an "atmosphere of uncertainty, distrust and intimidation between the district administration and the [high school] staff."

Zellner, in his capacity as Union president, refused to agree to Herrick's proposed Qualified Economic Offer ("QEO") that resulted in salary reductions for Cedarburg teachers, making them among the lowest paid in the area. Zellner also facilitated a "District Leadership Survey Report" in which Union members evaluated the performance of administrators. The report was extremely critical of Herrick. When Zellner attempted to present the report to the School Board, Herrick directed Board members not to open the report.

Following a contentious contract negotiation session between the Union and School Board, Herrick warned

Zellner that "the gloves would come off" if the Union did not back down. He also informed Zellner that a "prominent member of the community" had claimed Zellner was into pornography, but that because it was not school-related, he would not report Zellner at that time.

In December 2004, Zellner, as Union president, publicly spoke in opposition to the creation of a task force by Herrick because Principal Grieger and volunteer teachers were not allowed to participate. A month before Herrick's contract was up for renewal, Zellner informed Herrick that the Union had secured a "no confidence" vote in his leadership by some 95 percent of participating teachers. The vote was discussed at several school board meetings in 2005.

In January 2005, in his capacity as Union president, Zellner issued a press release titled, "District Teachers Vote 'No Confidence' in . . . Herrick," and held a press conference on the same subject. Articles on the Union's position, and Herrick's response, were published in the *Milwaukee Journal Sentinel* and the *Cedarburg News Graphic*.

Shortly thereafter, the School Board required that Union representatives, including Zellner, meet with Herrick, members of the District leadership team, and the Board, for the stated purpose of attempting to improve relations between the Union and the District. A meeting was held on January 24, 2005, and all parties agreed that it would be "off the record," and no notes would be taken. After the meeting, Herrick sent an e-mail to Pendergast (who missed part of the meeting) summarizing what had occurred.

Following the meeting, a citizen made an open records request, and the District produced the e-mail between Herrick and Pendergast. In the e-mail, which Zellner believes breached the "off the record" agreement, Herrick stated that the teachers gave him an ultimatum to accept only a one-year contract and told him the Union would not work with him if he agreed to renew for two years. Upon receiving the e-mail, the citizen wrote to the Ozaukee County Sheriff and District Attorney complaining about the Union's ultimatum and asking them to investigate whether it violated any laws. An article was also published in the *Milwaukee Journal Sentinel* discussing the e-mails and the potential investigation.

Soon after the meeting, the Board offered Herrick—and he accepted—a new two-year contract. In April 2005, all incumbent Board members were re-elected, giving them what they considered to be a "tough" mandate in dealing with the Union. By June, the Board and the Union had not reached an agreement on the Collective Bargaining Agreement for 2003-2005, and the Board implemented a second QEO resulting in further salary reductions, again making Cedarburg teachers among the lowest paid in the area.

In August 2005, Zellner's term as Union president ended, but he still remained involved in union activities until his termination. Relations between the Union and the District remained volatile, but Zellner did not speak out publicly or talk with Herrick or Pendergast personally regarding Union issues any time after February 24, 2005.

On December 15, 2005, the *Milwaukee Journal Sentinel* published an article entitled, "Cedarburg Losing More Teachers—Some Cite Low Pay, Politics at High School." In the article Zellner is reported as saying, "When you start losing veteran teachers to retirement that is one thing," but "when younger teachers leave, it's a real warning." Zellner claims that Herrick and Pendergast were aware that he was interviewed (they were also interviewed for the article) and that they knew what he said.

Significantly more relevant to Zellner's termination is the fact that on August 15, 2005, the School Board updated its computer usage policy entitled, "Employee Access to Networked Information Resources" (the "Policy"). Zellner signed off on the updated Policy, acknowledging that he was responsible for compliance with it and that violations could result in a loss of access and/or disciplinary action. Included in the Policy is a rule notifying employees that their computer usage is not private and may be monitored. The Policy specifically states that "accessing, sending or displaying offensive messages, pictures or child pornography" is strictly prohibited. The Policy also states that the "network administrator will report inappropriate behavior to the employee's supervisor who will take appropriate disciplinary action."

In November 2004, the District's technology department had reimaged (wiped clean) a number of district employees' computers because of complaints of "spyware" and "popups." Zellner's school computer was reimaged at this time, and Borkenhagen, as we said the District's

Director of Technology, was aware of the reimaging. Almost ten months later, in late August 2005, Zellner reported that his computer had "gone crazy," and he was unable to use it. Zellner's computer was again reimaged. Jeanne Dries, the IT technician who reimaged Zellner's computer, told Borkenhagen that Zellner's computer was very messed up and that in her opinion it "doesn't get that way without some behavior that— going to sites that were questionable." Borkenhagen reported to Herrick, her supervisor, that Zellner's computer had to be reimaged a second time. Borkenhagen did not notify Grieger, Zellner's immediate supervisor.[2]

After Herrick learned about the second reimaging, he directed Borkenhagen to place monitoring software on Zellner's computer. The software continually logged Zellner's computer activity, but the results were not viewable unless they were specifically accessed. Borkenhagen initially checked the log every day, but after a while she checked with decreasing frequency. Zellner acknowledges that the District had the right to place monitoring software on his computer.

On Sunday, November 6, 2005, Zellner was at school working on his class plan and used his school computer to conduct a Google Image search. First, Zellner disengaged the "safe search" filter. He then typed "blonde" into

_____

[2] According to the Policy, Borkenhagen must report all "inappropriate behaviors," "violations" or "complaints" to the employee's supervisor, in this case, Grieger. At this time, however, Zellner had not been accused of violating a policy.

the Google search box. The search produced 20 "thumb-nail" images, all of them pornographic, with links to more images within and outside the Google website. He then clicked to display the next 20 images. Zellner then clicked a link entitled "more of these" adjacent to images from www.ardentes.free.frblonde.com. When Zellner did so, another 20 pornographic "thumbnail" images were displayed on his monitor for a total of 17 seconds. Zellner did not click on any of the photographs displayed in his search. The entire incident took 67 seconds.

In early December Borkenhagen viewed the log from Zellner's November 6 search. She was alerted by the search term "blonde" in Zellner's activity log. Borkenhagen recreated Zellner's activities, which Zellner admits are accurate. Shortly after Borkenhagen discovered the search, she informed Herrick and gave him the accurate log of what happened. Herrick relayed the information to Pendergast.

On December 20, 2005, Herrick and James R. Korom (the District's legal counsel) met with Zellner and his union representative, Patrick Connolly, to discuss Zellner's November 6 Google Image search. The meeting was not recorded. Zellner was first asked to confirm the details of his "blonde" search, and that the images obtained by recreating his search were accurate, which he did. Zellner was then asked if he had performed similar searches in the past, and he confirmed that he had. According to Herrick, Zellner's response was "not more than monthly." According to Zellner he responded, "once in that month." Furthermore, he admitted that

he had accessed pornography on a District computer five or six times over several years. Zellner also conceded that his actions on November 6 were a violation of the District's Policy and legitimate expectations.

At the meeting, Zellner offered to sign a last chance agreement or resign at the end of the school year. Herrick did not accept these offers and instead gave Zellner the option to resign immediately or have the matter put before the School Board. The meeting ended with all parties understanding that Zellner would have an extended period of time to decide whether to resign or go forward with a hearing. All parties also understood that ultimately only the School Board could decide Zellner's fate. Subsequently, Herrick learned that Zellner had decided not to resign. Herrick, Korom, and Pendergast then conferred by telephone and decided the School Board would hold a disciplinary hearing in January.

As School Board President, it was Pendergast's responsibility to determine whether the meeting would be an open or closed session. Pendergast knew that Zellner had requested a closed hearing, and although he did not know the exact details of the evidence—only that the District had discovered what it said was pornography on Zellner's computer, about a week before the January 17 hearing, he decided it would be an open session. He did so knowing that, given the subject matter, an open hearing would likely damage Zellner's reputation.

According to Zellner, the long-standing practice of the School Board was not to identify an employee by name, or describe charges in advance of a disciplinary hearing.

However, the notice of hearing published by Pendergast identified Zellner by name and described the charge against him as misuse of a School District computer. There was no mention of pornography in the notice.

Before the hearing, Herrick asked Borkenhagen to find a forensic analyst to inspect Zellner's computer to determine if there was any other inappropriate content which had been deleted. Borkenhagen hired a firm which returned a disk of files found on the hard drive. Borkenhagen gave the disk to Herrick, and, at Herrick's request, printed out the images.

Herrick and Korom prepared charges which were sent to Zellner via certified mail, but were otherwise not released to anyone prior to the meeting. Paragraph 5(g) of the charges reads as follows: "[Zellner] selected one photo from the second page of his search results, and accessed the website entitled 'ardentes.free.frblonde,' and then reviewed images on that pornographic website." Paragraph 7 of the charges states that "[a]nalysis of Mr. Zellner's computer revealed additional evidence. Among other images, Zellner had retained photographs of female students of the District wearing bikinis while on a school-sponsored trip to Hawaii" that Zellner chaperoned.[3]

---

[3] The photos were taken by students while in Hawaii for a biology trip and were used for the school yearbook. Pendergast admitted that none of the photos of students were inappropriate and that Zellner could no longer access the photos as they had been deleted.

On January 17, 2006, the School Board held a hearing regarding the charges against Zellner. Zellner was represented by Union counsel, the administration was represented by Korom, and the School Board had its own counsel present. Zellner was given an opportunity to prepare and present evidence. Herrick testified on behalf of the District, and Zellner called Connolly as a witness to testify on his behalf about what happened in the December 20 meeting. Zellner chose to read a statement to the Board instead of testifying. In his statement, Zellner neither offered an excuse for his actions on November 6, nor denied the charges. He merely stated, "I am truly sorry for what happened," and "I know I used poor judgment in this case. I made a mistake and it will never happen again." (In his original complaint, Zellner claims that he ran the search to report to the IT department what students could access via school computers. However, because he didn't testify, the School Board never heard this version of events, or what his intent was in accessing the images.) At the conclusion of the hearing, the Board deliberated in closed session for a few hours. It considered various reprimands, and ultimately determined that termination was the appropriate course of action.

After the School Board terminated Zellner's employment, he filed a grievance which went to arbitration. The arbitrators found that Zellner violated the District's Policy, but rescinded the termination. The School District refused to abide by the arbitration decision. Zellner then filed a lawsuit in Wisconsin Circuit Court seeking confirmation of the arbitration award. Both the Circuit

Court and the Wisconsin Court of Appeals found that the School Board's termination was supported by just cause. The bottom line was that the arbitrators' award was reversed. Zellner's termination was upheld.

Zellner then filed this suit in federal court. The court granted the District's motion to dismiss with regard to Zellner's due process claim, finding that he failed to plead it was virtually impossible for him to find new employment. Subsequently, the court granted the District's summary judgment motion with respect to Zellner's remaining First Amendment claim, finding he failed to prove that his union activities were the "but for" cause of his termination, and that he failed to prove the November 6 Google Image search was a phoney pretextual reason for his termination.

We review *de novo* the district court's grant of the District's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *Opp v. Office of State's Attorney of Cook County*, 630 F.3d 616, 619 (7th Cir. 2010). To survive a motion to dismiss, the plaintiff must do more in the complaint than simply recite elements of a claim; the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We also review the district court's grant of summary judgment *de novo*. *Nemsky v. ConocoPhillips Co.*, 574 F.3d 859, 864 (7th Cir. 2009). Summary judgment is appropriate where the admissible evidence shows that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008) (internal quotation marks omitted).

On appeal, Zellner first argues that the court incorrectly dismissed his due process claim because it did so *sua sponte*. A complaint may be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) "only if 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Ricketts v. Midwest National Bank*, 874 F.2d 1177, 1183 (7th Cir. 1989) (internal citations omitted). Zellner correctly notes that we do not encourage district courts to dismiss claims *sua sponte.* Instead, we strongly encourage giving a party notice of an intention to dismiss and an opportunity to respond. But Zellner's argument misses the mark.

Even if Zellner were able to prove "all of the other elements necessary to make out a claim of stigmatization . . . the remedy mandated . . . is 'an opportunity to refute the charge'" against him during a hearing. *Codd v. Velger*, 429 U.S. 624, 627 (1977). The purpose of a hearing is to provide the person "charged" with an opportunity to clear his name. *Id*. Here, Zellner unquestionably received a hearing and was given an opportunity to clear his name. The School Board held an open hearing at which Zellner was allowed to present evidence and witnesses to tell his side of the story—but

he decided not to testify. Instead, he read a statement in which he did not dispute the charges against him, but only apologized. Zellner has already received all the relief he is entitled to, and therefore his due process claim fails.

As to the summary judgment decision with respect to his First Amendment claim, Zellner argues that he established a *prima facie* case of retaliation as well as evidence of pretext. The First Amendment prohibits a public employer from retaliating against an employee for engaging in protected speech. *See Callahan v. Fermon*, 526 F.3d 1040, 1043-44 (7th Cir. 2008). To make out a *prima facie* case of First Amendment retaliation, a plaintiff must present evidence that: (1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating favor in the employer's action. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). In other words, the plaintiff bears the burden of proving "but for" causation. *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2350 (2009*); Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009) (applying *Gross* to First Amendment claims under 42 U.S.C. § 1983).

Once a plaintiff demonstrates that an improper purpose was a motivating factor, the burden shifts to the defendant to show that the same decision would have been made in the absence of the protected speech. *Massey*, 457 F.3d at 717. If the defendant carries that burden, the plaintiff must then demonstrate that the defendant's proffered reasons for the decision were pretextual and

that retaliatory animus was the real reason for the decision. *Id*. At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie. *Vukadinovich v. Board of School Trustees*, 278 F.3d 693, 699 (7th Cir. 2002).

Zellner argues that the history of animosity between the Union and the District—culminating in the December 15 publication of the *Milwaukee Journal Sentinel* article, in which Zellner was critical of the District—is ample support that "but for" his union activities he would not have been terminated. But "the fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation." *Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006). While it is abundantly clear that the relationship between the Union and the District was contentious, combative, and miserable, and that Zellner and the District played a central role in the relationship, Zellner ignores the discovery of his November 6 Google Image search. It is undisputed that the search violated the District's Policy, that Zellner admitted that he performed the search, and that he knew he violated the Policy. Accordingly, the School Board had a legitimate, non-discriminatory reason to terminate Zellner's employment.

Zellner argues that the only reason the Board had the information was because Borkenhagen improperly reported his violation to Herrick instead of Zellner's direct supervisor, Grieger. But this argument is a non-starter. It doesn't really matter to whom Borkenhagen reported Zellner's conduct. Zellner violated the District's Policy

by viewing pornographic images on his school computer, the violation had nothing to do with his union activities, and the School Board found that this violation should result in termination. Accordingly, the district court correctly ruled that no jury could find that "but for" the plethora of Zellner's union activities and statements, the School Board would not have terminated his employment. Zellner's *prima facie* claim thus failed on the element of causation.

Moreover, even if Zellner had proved causation, the burden shifts to the District to show that the same decision would have been made in the absence of Zellner's union activities. *See Valentino v. Village of South Chicago Heights,* 575 F.3d 664, 670 (7th Cir. 2009). Here, Zellner runs into the same problem—he directly and knowingly violated a School Board Policy. He admitted as much in front of the Board at his hearing and apologized for his actions. Zellner thus failed to establish proof that the Google Image search was a pretext for firing him. Without evidence that some other teacher violated the Policy in a similar way and received a milder sanction, Zellner's "but for" case rests on conjecture. Accordingly, he cannot rebut the District's legitimate, non-discriminatory reason for his termination. The judge correctly granted the District's motion for summary judgment with respect to Zellner's First Amendment claim.

For the foregoing reasons, the judgment of the district court is AFFIRMED.